```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
                      CENTRAL DIVISION

DORA L. VILLEGAS as the        )
Administrator of the Estate    )
of Cesar Villegas, and DORA L. )
VILLEGAS, Individually,        )
                               )    NO. 4:03-cv-30433
        Plaintiff,             )
                               )    RULING ON DEFENDANTS'
   vs.                         )    MOTIONS FOR SUMMARY
                               )    JUDGMENT
ALEWELT, INC. and PORK-N-MORE  )
INC., and JOE and SANDY        )
NELSON,                        )
                               )
        Defendants.            )
```

Before the Court are motions for summary judgment filed by defendants Pork-N-More, Inc. [30] and Joe and Sandy Nelson [39]. This case involves the tragic death of Cesar Villegas in a construction accident. Mr. Villegas was killed on April 30, 2002 during the construction of a hog finishing building loading chute on the Nelson defendants' farm in Jefferson County, Iowa. Plaintiff, Mr. Villegas' surviving spouse, filed her complaint in this Court on August 6, 2003, making state law negligence claims against defendants Alewelt, Inc., Mr. Villegas' employer, and Pork-N-More, Inc., the general contractor for the project. On March 31, 2004, plaintiff was granted leave to amend her complaint to add the Nelson defendants as parties and to assert state law negligence claims against them.

The Court has diversity jurisdiction. 28 U.S.C. § 1332. The undersigned has been assigned the case pursuant to 28 U.S.C. § 636(c). Oral argument on the motions was held on March 7, 2005. The motions are fully submitted.

**I.**

**SUMMARY JUDGMENT**

Defendant is entitled to summary judgment if the affidavits, pleadings, and discovery materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Erenberg v. Methodist Hospital, 357 F.3d 787, 791 (8th Cir. 2004)(quoting Fed. R. Civ. P. 56(c)). The Court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." Mathes v. Furniture Brands Int'l, Inc., 266 F.3d 884, 885-86 (8th Cir. 2001)(citing Sprenger v. Federal Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001)); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Erenberg, 357 F.3d at 791; Tademe v. St. Cloud State University, 328 F.3d 982, 987 (8th Cir. 2003); Lambert v. City of Dumas, 187 F.3d 931, 934 (8th Cir. 1999); Kopp v. Samaritan Health System, Inc., 13 F.3d 264, 269 (8th Cir. 1993). An issue of material fact is genuine if it has a real basis in the record. Hartnagel v.

Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citing Matsushita, 475 U.S. at 586-87 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." Hartnagel, 953 F. 2d at 395 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see Hitt v. Harsco Corp., 356 F.3d 920, 923 (8th Cir. 2004); Rouse v. Benson, 193 F.3d 936, 939 (8th Cir. 1999).

It is the non-moving party's obligation to "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." Rouse, 193 F.3d at 939; see Hitt, 356 F.3d at 923. In assessing a motion for summary judgment a court must determine whether a fair-minded trier of fact could reasonably find for the non-moving party based on the evidence presented. Anderson, 477 U.S. at 248; Herring v. Canada Life Assurance Co., 207 F.3d 1026, 1030 (8th Cir. 2000).

**II.**

**FACTUAL BACKGROUND**

The background facts on which the summary judgment motions rest are essentially undisputed. The parties are in disagreement about the conclusions to be drawn from those facts.

Plaintiff is a citizen of New Mexico. The decedent was a citizen of New Mexico at the time of his death.

Defendants Joe and Sandy Nelson own a farm in Jefferson County, Iowa and are citizens of Iowa. As a part of his farming activities Joe Nelson operates a custom feeding hog finishing operation. He also works part-time as a heavy equipment operator for Diers Construction Company of Brighton, Iowa. A hog-finishing building was constructed on his farm in 1994.

Defendant Pork-N-More, Inc. ("PNM") is an Iowa corporation with its principal place of business in Iowa. It is owned and operated by Craig Jones. PNM is in the business of selling, building, repairing and remodeling hog confinement buildings. PNM performed service work for Joe Nelson on the original hog-finishing building.

In March 2002 Mr. Nelson contacted Jones about constructing a second hog-finishing building on the farm. Jones submitted a "proposal contract" or bid which summarized the work to be performed and the bid price. (Nelson App. 0045-0048). The parties agree the document was never signed, but that it provided the basis of the agreement between Nelson and PNM. The agreement provided that the farmer/owner would arrange for all excavation/backfilling work. PNM planned to subcontract the concrete and insulation work. (Id. 0017-18).

The proposal included a "loading shoot"[1] which would connect the finishing building with transport trailers, facilitating the transfer of hogs to and from the building and the trailers. PNM's proposal contemplated the chute would come straight out from or perpendicular to the east wall of the new building.

PNM attempted unsuccessfully to hire a concrete subcontractor with which it had done business. Jones then contacted Alewelt, Inc., of Springfield, Illinois about performing the concrete work on the pit floor and pit walls of the finishing building. Alewelt was not hired to do the concrete work on the loading chute. (Nelson App. at 32). Jones viewed the loading chute as a smaller project. (Id. at 33). There was no written contract between PNM and Alewelt.

Mr. Nelson performed the excavation work by hiring it out to his employer, Diers Construction, and then performing the work himself with Diers' machinery. He completed the excavation work in four to five days. Alewelt then began its concrete work on the building based on plans and drawings Jones had prepared. (Nelson App. 0013-14, 0026-27, 0028-29).

Cesar Villegas was an employee of Alewelt. He worked on the crew which performed the concrete work on the Nelson project.

---

[1] So spelled in the document. (Nelson App. at 47). The Court agrees with the Nelsons that "chute" is the better usage. (Nelson Brief at 3 n.1).

Marc Alewelt is the president of Alewelt, Inc. and worked on the job with his crew.

When the building was almost done, Nelson approached Jones about changing the design of the loading chute. The chute had two end-of-ramp elevations to accommodate the two kinds of trailers which would transport hogs: one 18" and the other 42". The "lay of the land" where the new building was situated was such that the proposed perpendicular chute could not be accessed by a semi-trailer. Nelson proposed to angle the chute. Nelson envisioned a three-walled configuration (two side walls and a middle "divider" wall to separate the two elevations). (Nelson App. 91-93, 106-07). Nelson also wanted a three- to five-foot gap between the chute and the building to enable him to enter the building and remove dead hogs without using the chute. (Pl./Nelson App. at 11).[2]

As Alewelt was finishing his work on the building, Jones and Nelson approached him and asked if his company could construct a loading chute while Alewelt was still there. (Nelson App. at 57). The three talked about Nelson's request to angle the chute. The change was not complicated. There is evidence they sketched the design in the dust on the hood of a pickup truck. (Pl./PNM App. at 101A). Alewelt recommended using one large footing instead of the

---

[2] For ease of reference, Plaintiff's Appendix in Support of Resistance to Nelson's Motion for Summary Judgment is referenced as "Pl./Nelson App." and Plaintiff's Appendix in Support of Resistance to PNM's Motion is referenced as "Pl./PNM App."

post-hole anchors in the original proposal, a change which necessitated additional excavating. (Nelson App. at 60-61). Alewelt agreed to undertake the additional work, but again no written contract was signed with either PNM or Nelson.

Nelson did the additional excavating. Either the same day or the day after, Alewelt poured the footing. (Nelson App. at 61-62, 93-94). The next day, April 30, 2002, Alewelt's crew set 3' by 8' aluminum forms in place in preparation for pouring the walls of the chute. (Id. at 63-64). Nelson did not provide the forms or assist in setting them up. (Id. at 95, 101).

Alewelt and Nelson knew it was not possible to back up a cement truck and use its chute to pour the concrete. (Pl./PNM App. at 87). Either a concrete pump truck or a concrete hopper bucket had to be used to elevate the concrete to pour into the forms. (Nelson App. at 66). Use of a hopper bucket was cheaper and Nelson told Alewelt he would use the excavator to lift the bucket to the top of the wall forms. (Pl./PNM App. at 87; PNM App. at 33). Alewelt asked Jones to rent the hopper bucket. Jones did so and brought it to the site. He left after delivering the bucket, within a few minutes time. (Pl./PNM App. at 19). Alewelt's crew poured the concrete from the bucket. (Nelson App. at 65, 108-09). The concrete pours were finished by 11:00 a.m. or noon. Alewelt's crew then left the job site while the concrete "set up." (Id. at 110-11).

Nelson left his farm to attend his son's track meet. (Nelson App. at 96). Unknown to Nelson or Jones, Marc Alewelt told his crew they could return to the job site that evening to pull or strip the concrete forms from the chute walls. (Id. at 67, 96). At approximately 6:00 p.m. the crew, including Mr. Villegas, returned to Nelson's farm and began removing the aluminum forms from the chute walls. (Id. at 68). While the crew was removing the forms, the walls collapsed. Mr. Villegas was crushed under the weight of the collapsed concrete and died as a result of his injuries. (Id. at 71-73). Marc Alewelt was at another job site and drove to Nelson's farm after receiving a call from one of the crew about the accident. (Id. at 69-71). Neither Nelson nor Jones knew about the accident until the next morning. (Id. at 38, 96).

On the date of the accident Marc Alewelt believed his company had workers' compensation insurance coverage. However, he subsequently discovered that the company's coverage had lapsed one to two months before the accident. (Nelson App. at 76-77).

### III.

### DISCUSSION

The present motions present the question of whether the defendants owed a duty of care to plaintiff's decedent as the employee of a subcontractor. That is a legal issue for the Court to determine and may properly be addressed on a motion for summary judgment. See Robinson v. Poured Walls of Iowa, Inc., 553 N.W.2d

873, 875 (Iowa 1996); Downs v. A. H. Construction, Ltd., 481 N.W.2d 520, 522 (Iowa 1992); Lunde v. Winnebago Indus., Inc., 299 N.W.2d 473, 475 (Iowa 1981); Goebel v. Dean & Assoc., 91 F. Supp. 2d 1268, 1273 (N.D. Iowa 2000). However, genuine issues about predicate facts on which the existence of a duty depends may prevent summary judgment. Goebel, 91 F. Supp. 2d at 1273.

A possessor of land has "'a duty to use ordinary care to keep the premises in a reasonably safe condition for business invitees.'" Van Essen v. McCormick Enterprises Co., 599 N.W.2d 716, 719 (Iowa 1999)(quoting Konicek v. Loomis Bros., Inc., 457 N.W.2d 614, 618 (Iowa 1990)). The parties agree that Villegas stood in the position of a business invitee. In the case of the work of independent contractors, however, the general rule, to which there are many exceptions, is that the employer of an independent contractor is not liable for injuries resulting from the contractor's negligence. Lunde, 299 N.W.2d at 475; see Robinson, 553 N.W.2d at 875; Kragel v. Wal-Mart Stores, Inc., 537 N.W.2d 699, 702-03 (Iowa 1995); Restatement (Second) of Torts § 409 (1965)(hereinafter "Restatement"). The reason for the rule is the employer's lack of control of the details of the contractor's work. Lunde, 299 N.W.2d at 475.

With respect to her claims against both the Nelsons and PNM plaintiff relies on two exceptions to the general rule identified in the Restatement: (1) § 422 dealing with the liability

of possessors of land; and (2) § 414 concerning retained control over the work of a contractor.[3] In practical operation the two exceptions are very similar because they focus on the degree of control exercised or retained over the work of the contractor.

Plaintiff has also alleged PNM and the Nelsons failed to exercise reasonable care by employing a contractor who did not have workers' compensation insurance, a subject discussed separately later.

## A.  Safe Premises and Retained Control

The liability of possessors of land who employ independent contractors is governed by Restatement § 422:

> A possessor of land who entrusts to an independent contractor construction, repair, or other work on the land, or on a building or other structure upon it, is subject to the same liability as though he had retained the work in his own hands to others on or outside of the land with physical harm caused to them by the unsafe condition of the structure (a) while the possessor has retained possession of the land during the progress of the work, or (b) after he has resumed possession of the land upon its completion.

See Lunde, 299 N.W.2d at 479. "The status of a 'possessor of land' turns on occupation and control of the land, not mere ownership." Wiedmeyer v. Equitable Life Assur. Soc., 644 N.W.2d 31, 33 (Iowa 2002); see Van Essen, 599 N.W.2d at 719. Restatement § 328E defines

---

[3] Plaintiff does not rely on the "peculiar risk" or "inherent danger" exceptions in Restatement §§ 216 and 427.

a possessor of land as "[a] person . . . in occupation of the land with intent to control it."

Restatement § 422 is a rule of vicarious liability. Where applicable it makes the employer of an independent contractor liable for the negligence of the contractor which causes physical harm. Written in terms of who possesses the land at the time of injury the exception textually seems relatively broad in scope. However, as applied by Iowa courts the focus of the § 422 exception is narrower and in another direction. The supreme court has observed that "[a]lthough the possessor of land exception is defined by control over the land, courts make this determination by looking at the degree of control exercised over the work." Robinson, 553 N.W.2d at 876 (emphasis original). The employer's "involvement in overseeing the construction must be substantial in order to impose liability under a safe premises theory." Downs, 481 N.W.2d at 524 (quoting Lunde, 299 N.W.2d at 479); see Robinson, 553 N.W.2d at 875-76 (also quoting Lunde).

Restatement § 414 is a specific retained control exception. Where the employer of an independent contractor retains control of any part of the work the employer has a duty to others to use reasonable care in exercising the control retained.

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for

>>physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Id. Here also the retained control must be substantial.

>>. . .[t]he employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

See Downs, 481 N.W.2d at 525 (quoting cmt. c); Hernandez v. Midwest Gas Co., 523 N.W.2d 300, 303 (Iowa App. 1994)(same); Piper v. Jerry's Homes, Inc., 2003 WL 22199580 at *3 (Iowa App. 2003)(Table case)(unpublished). The person who hires a contractor may, therefore, retain a "broad general power of supervision and control as to the results of the work so as to insure satisfactory performance . . . including the right to inspect, the right to stop the work, the right to make suggestions or recommendations as to details of the work, the right to prescribe alterations or deviations in the work, -without changing the relationship" from employer-independent contractor to one of agency. Lunde, 299 N.W.2d at 479-80 (quoting Stilson v. Moulton-Niquel Water District, 21

Cal. App. 3d 928, 936, 98 Cal. Rptr. 914, 918 (1971)(quoting in turn McDonald v. Shell Oil Co., 44 Cal.2d 785, 790, 285 P.2d 902, 904 (1955)).

    1.    The Nelsons

The Nelsons owned the land. Mr. Nelson hired PNM to build the finishing building. He performed all of the excavation work for the project, including the additional work occasioned by the loading chute design change. At Nelson's direction the configuration of the chute was changed to meet his specifications. That Nelson contributed his own labor, specified the requirements for the loading chute, and altered its design are insufficient, under the authorities cited, to establish that he exercised the requisite degree of control over Alewelt's work, or retained control of the manner in which it was performed, so as to impose liability under either the safe premises or retained control exception.

Nelson proposed the hopper bucket as the means to pour the concrete used to construct the loading chute. He also used his employer's excavating equipment to lift the hopper bucket to the top of the forms in order to pour the concrete. Nelson's preference for the hopper bucket and use of the excavator to lift the bucket was a measure of control of the means by which the concrete would be poured into the forms, but the use of the hopper bucket to pour concrete was not causally related to the injury to Mr. Villegas.

Mr. Nelson did not oversee Alewelt's work in any significant way, or retain or exercise any degree of control of the manner or methods by which Alewelt set or removed the forms for the concrete. As a matter of law, the circumstances did not give rise to a duty of care on the part of Mr. Nelson toward Alewelt's employees beyond a duty of care in Nelson's operation of the excavator. The Nelsons are entitled to summary judgment.[4]

    2.    PNM

Craig Jones, PNM's president and construction supervisor, hired Alewelt to undertake the concrete work for the pit floor and walls of the finishing building. While the building was under construction Jones made numerous visits to the job site. (PNM App. at 108-09). He provided Alewelt with diagrams of the outside measurements of the pit walls and diagrams depicting rebar placement for the building. (PNM Supp. App. at 15, 17). He helped

---

[4] It is appropriate at this point to note several matters concerning the claim against the Nelsons. First, there is no evidence that Mrs. Nelson had anything to do with the project beyond her status as a property owner.

Second, plaintiff has argued that because Nelson offered the opinion the forms were taken down too soon, he knew or should have known that Alewelt would carry out its work in a dangerous manner. Nelson's opinion as to the cause of the accident is not evidence of knowledge that Alewelt would take the forms down when it did.

Lastly, Restatement § 422 imposes vicarious liability on a possessor of land who "entrusts" work to an independent contractor. Alewelt was hired by PNM, not the Nelsons. The Court believes, however, that § 422 does not depend on a formal contractual relationship. Nelson and PNM's Jones talked to Mr. Alewelt about doing the additional concrete work on the loading chute, and viewing the facts favorably to plaintiff it is fair to regard Nelson has having entrusted the work to him.

set flags out for placement of the building. (Id. at 15, 23). Jones or an employee of PNM delivered rebar to the job site. (Id. at 27). He inspected the floor of the building the first day Alewelt was on the job to make sure rebar placement was correct. (Id. at 22). On another visit, Jones inspected to see that rebar placement in the walls was correct and that the "pump-outs" looked okay. (Id. at 23). As Alewelt testified: "[Jones] told me exactly what he wanted, made sure we were doing it right, made sure our rebar was to his specification, specification of the floor, the walls, the pump-out locations." (Pl./PNM App. at 90). For his part, Jones admitted he was more vigilant in inspecting Alewelt's work because he had not dealt with him before. "I wanted to make sure it was done correct." (Id. at 53-54).

Evidently Alewelt's work on the building proper was satisfactory. When Nelson talked to Jones about reconfiguring the design of the loading chute, the two of them approached Alewelt about constructing the chute before he left the job site. Alewelt agreed to do the work. Jones left it to Alewelt and Nelson to work out the details concerning the loading chute. (PNM App. at 33). From this point most of Alewelt's contacts concerning the chute were with Mr. Nelson. (Id. at 32). Alewelt testified Jones "didn't really participate much more." (Pl./PNM App. at 91).

That PNM furnished material, provided specifications and plans for the concrete work on the finishing building, and

15

inspected the work to make sure it was done correctly evince the exercise of the kind of broad supervision normally performed by general contractors which, under Lunde, and subsequent cases would ordinarily not be sufficient to establish that PNM owed a duty of care to Alewelt's employees under either Restatement § 422 or § 414. However, viewing the evidence favorably to plaintiff, the greater vigilance with which Jones viewed Alewelt's work, Alewelt's testimony that Jones "made sure we were doing it right" and the absence of a contract setting out the rights and responsibilities between general and sub-contractor, might reasonably permit an inference that implicit in the agreement between Alewelt and PNM was an understanding that PNM retained the right to control the manner in which Alewelt's work on the finishing building was performed.[5]

That work, though, was essentially complete when Alewelt was approached to do the loading chute. The loading chute was a separate part of the overall project which Alewelt had not been hired to perform. PNM's involvement with Alewelt's work on the loading chute was limited to securing Alewelt's agreement to do the work according to Nelson's design and specifications (such as they

---

[5] This is not a case in which an express contract between the general contractor and subcontractor imposed a contractual duty on the general contractor to maintain the safety of the workplace. See Giarratano v. Weitz Co., 259 Iowa 1292, 1305, 147 N.W.2d 824, 832 (1967); Farris v. General Growth Dev. Corp., 354 N.W.2d 251, 254-55 (Iowa App. 1984).

16

were), to put the two of them together to work out the details, and to rent the hopper bucket. PNM, in the person of Jones, was not present when the work was performed, did not inspect it, and did not supervise it. PNM thus did not oversee construction of the loading chute nor did it retain control over the manner in which Alewelt did the work on the loading chute. Consequently, PNM also did not owe a duty of care to Alewelt's employees in connection with Alewelt's work in constructing the loading chute and is entitled to summary judgment.

**B.    Alewelt's Lack of Workers' Compensation Insurance**

Included among the specifications of negligence pleaded against the Nelsons and PNM is an allegation that they knew, or should have known, that Alewelt was not covered by a policy of worker's compensation insurance as required by Iowa law.[6] Plaintiff bases her cause of action in this regard on Restatement § 411 which has to do with negligence in the selection of a contractor.

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor (1) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons.

Id.

---

[6] Plaintiff does not brief the issue with respect to the Nelsons, hence it is analyzed only with respect to PNM's role as general contractor.

17

PNM asked Alewelt to provide proof of insurance. (Pl./PNM App. at 82). Alewelt had its broker send a certificate of insurance. (Id.) The certificate did not show that workmens' compensation coverage was in effect. (Id. at 126). Alewelt did not know until after the accident that its workers' compensation coverage had lapsed. (Id. at 82).

The Iowa Supreme Court has not adopted Restatement § 411. See Duggan v. Hallmark Pool Mfg., Inc., 398 N.W.2d 175, 179 (Iowa 1986); Piper, 2003 WL 22199580 at *4. The court has observed that "the right to workers' compensation is purely statutory" and that Iowa's statute does not impose workers' compensation liability on general contractors to the employees of uninsured subcontractors. Downs, 481 N.W.2d at 507. Even if § 411 were the law in Iowa, it does not apply to claims based on the financial irresponsibility of the contractor. Piper, 2003 WL 22199580 at *4 n.3; Restatement § 411 cmt. g. The duty articulated in the Restatement is a duty to exercise reasonable care to employ a contractor who will competently and carefully perform the contracted work, or perform a duty the employer owes to third persons. There is no evidence that at the time PNM employed Alewelt it had reason to know Alewelt would be incompetent or careless. See Piper, 2003 WL 22199580 at *4. Nor did PNM hire Alewelt to perform any duty PNM owed to Villegas. This Court very much doubts the Iowa Supreme Court would (or could given § 411's purpose and limitations) employ § 411 as a

vehicle to recognize a common law duty on the part of a general contractor to exercise reasonable care to insure that its subcontractors have workers' compensation insurance for their employees.

## IV.

## RULING AND ORDER

The Nelson defendants' motion for summary judgment [39] is **granted**. PNM's motion for summary judgment [30] is **granted**. This matter remains set for trial on May 16, 2005 with respect to the claims against defendant Alewelt.

IT IS SO ORDERED.

Dated this 4th day of May, 2005.

_____
ROSS A. WALTERS
CHIEF UNITED STATES MAGISTRATE JUDGE